J-A06018-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL LEE BOURGEOIS | : | |
| | : | |
| Appellant | : | No. 570 MDA 2018 |

Appeal from the Judgment of Sentence November 3, 2017
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0004224-2001

BEFORE: OTT, J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED APRIL 12, 2019**

Appellant Michael Lee Bourgeois appeals from the judgment of sentence imposed after the trial court resentenced him to an aggregate term of eighty years to life imprisonment for two counts of first-degree murder[1] and related offenses. Appellant claims the court imposed an unconstitutional *de facto* sentence of life imprisonment without the possibility of parole (LWOP) in violation of the Pennsylvania Supreme Court's holding in ***Commonwealth v. Batts***, 163 A.3d 410 (Pa. 2017) (***Batts II***), and challenges the discretionary aspects of his sentence. We affirm.

The trial court opinion set forth the relevant facts of this appeal as follows:

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a).

On Saturday, September 1, 2001, [Appellant], along with Landon May, Steven Estes, and Raymond Navarro Perez, committed a burglary at the home of Lloyd and Beverly Good, who were away on vacation for the extended Labor Day weekend. After ransacking the home, the perpetrators fled the scene in the two vehicles, which had been parked in the garage. Other items taken from the house included revolvers, shotguns, rifles, shells, assorted hunting knives, a compound bow, and cash.

The next day, September 2, 2001, [Appellant] and Estes entered a Turkey Hill convenience store wearing camouflage and masks. They pointed handguns at the clerk and demanded money. They fled the store with $253.00. May later confessed that he was the driver of the "get-away" car and that Drenea Rodriguez had assisted in the planning of the robbery and also benefitted financially from the crime.

The residential burglary was discovered by the Good family on Monday, September 3, 2001. The home was processed for latent fingerprints and on Wednesday, September 5, 2001, Trooper A.J. Mizzoni of the Pennsylvania State Police received information that one of the prints lifted from the Good residence matched fingerprints on file belonging to [Appellant]. Efforts to locate [Appellant] at his last known address . . . were unsuccessful on September 5, 2001.

On the evening of September 5, 2001, Lucy Bourgeois Smith and her husband, Terry Smith, went to [Appellant's residence] to see Lucy's son, Appellant. [Appellant] had moved out of the family home . . . approximately two months earlier and into [his current residence], which was leased to Rodriguez. [Appellant] (age 17) and Rodriguez (age 33) were romantically involved. The Smiths dropped off a saxophone belonging to [Appellant], reminded him of a scheduled doctor's appointment, and informed him that the State Police had called looking for him.

On Thursday, September 6, 2001, at approximately 10:00 a.m., the Ephrata Borough Police Department received a telephone call from Diane Lamm, who was an employee of Terry Smith. Ms. Lamm advised the police that Terry Smith had not come to work, and that Terry's wife, Lucy, was an elementary school principal and that she also was not at work, which was unusual.

Detective David Shupp and Officer Douglas Heilman responded to [the Smiths' residence] at approximately 10:30 a.m. Upon learning from the State Police that [Appellant] was the son of Lucy Smith, that his fingerprint had been discovered at the scene of a local burglary, and that guns had been stolen from the house, the officers called for backup. At approximately 10:55 a.m., several officers entered the home through an unlocked sliding door. Upon entering the master bedroom on the second floor, the officers observed blood splatters on the mattress and wall and saw what appeared to be a body wrapped in a comforter on the floor in a pool of blood. A second body wrapped in bedding was found in a front bedroom.

The body in the front bedroom was eventually identified as Terry Smith and it appeared as though he had been stabbed repeatedly and shot multiple times in the head. The body in the master bedroom was identified as Lucy Smith and it appeared as though she had been severely assaulted to the left side of the head, as well as shot.

In the late morning hours of Thursday, September 6, 2001, Corporal Raymond Guth of the Pennsylvania State Police and Detective Shupp went to Rodriguez's residence . . . to interview [Appellant] regarding the Good burglary. During this interview, [Appellant] admitted to the officers that he and Perez had committed the Good burglary. [Appellant] was subsequently arrested on the burglary charge and taken into custody by Corporal Guth.

After waiving his **Miranda**[fn1] rights, [Appellant] gave a statement to the police on September 6, 2001, in which he admitted that he and May went to the Smith residence with the intent to commit a burglary. They entered the residence through a second floor window. When confronted by the Smiths during the course of the burglary, [Appellant] stated that he and May bound the Smiths with duct tape and then shot them with guns stolen from the Good residence. [Appellant] further admitted to taking a quantity of money from the house.

[fn1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

On the evening of September 6, 2001, May was arrested for the Good burglary and given his **Miranda** warnings, which he acknowledged in writing. May then proceeded to give a statement

to Detectives Ortenzi and Tobin in which he confessed to his participation in the killings of Terry and Lucy Smith.

\*    \*    \*

Wayne Ross, M.D., the Lancaster County forensic pathologist, performed autopsies on the bodies of Lucy and Terry Smith on September 7, 2001. He determined that Terry Smith was stabbed 47 times, his neck was cut at least five times, he was shot "execution-style" five times, and he was strangled or asphyxiated. There were no defensive wounds on Terry Smith.

During the autopsy of Lucy Smith, Dr. Ross obtained swabbings from her mouth. These swabbings were examined by a forensic scientist with the Pennsylvania State Police Laboratory, and were found to contain spermatozoa. A forensic scientist supervisor with the Pennsylvania State Police DNA Laboratory reported that the blood sample from Landon May matched the DNA of the sperm from the oral swabs taken from Lucy Smith. In addition to being sexually assaulted, Lucy Smith was cut 51 times, shot in the head, beaten on the left side of her head with a claw hammer, suffered blunt force trauma to her forehead, had 17 fractures to her skull, and was eventually smothered to death. She suffered defensive wounds to her hands and arms.

Based upon this evidence, the Commonwealth charged [Appellant], then 17 years old, with two counts of homicide, criminal conspiracy, robbery and burglary at Information No. 4224-2001, and with robbery, conspiracy and theft at Information No. 4975-2001, with respect to the Turkey Hill robbery. Pursuant to section 6355(e) of the Juvenile Act, [Appellant's] case was filed directly in criminal court, as the criminal division is vested with exclusive jurisdiction over the crime of murder.

On November 19, 2001, the Commonwealth informed [Appellant] and the [c]ourt of its intention to seek the death penalty. The three aggravating circumstances charged were that: (1) [Appellant] committed a killing while in the perpetration of a felony (burglary and robbery)[;] (2) in the commission of the offense, [Appellant] knowingly created a grave risk of death to another person in addition to the victim of the offense[;] and (3) the offense was committed by means of torture . . . .

The trial of [Appellant's] co-defendant May began on November 1, 2002. The jury found May guilty on November 27, 2002, of two counts of burglary, two counts of conspiracy, one count of involuntary deviate sexual intercourse, and two counts of first-degree murder for the killings of Terry and Lucy Smith. After a penalty hearing, the jury returned two sentences of death against May, having specifically found the aggravating factor of torture.

At that point, [Appellant] chose to resolve his charges through a negotiated plea agreement with the Commonwealth. Accordingly, on January 6, 2003, [Appellant] entered into an "Agreement for Truthful Testimony" with the Commonwealth in which [Appellant] agreed "to cooperate fully and truthfully with the Commonwealth in the investigation and prosecution of the persons responsible for the deaths of Lucy and Terry Smith, as well as the burglary, assault, robbery and theft crimes perpetrated by [Appellant], Landon May, Drenea Rodriguez, Steve Estes and any other person or crime of which he has knowledge." In exchange for this cooperation and testimony, the Commonwealth agreed to present a plea agreement in which [Appellant] would plead guilty to the first-degree murders of Lucy and Terry Smith and receive consecutive sentences of [LWOP].[fn7] As a result, [Appellant] was spared the death penalty.

> [fn7] Pennsylvania law mandated that if a person was found guilty of first-degree murder and did not receive the death penalty that he or she would receive a sentence of life imprisonment without the possibility of parole. *See* 18 Pa.C.S. § 1102(a)(1).

\* \* \*

On January 27, 2003, [Appellant] tendered a negotiated plea to all of the charges, with the exception of one count of robbery at No. 4224-2001 and one count of theft at No. 4975-2001, which were to be *nolle prossed* by the Commonwealth at the time of sentencing. After an extensive colloquy, the [trial court] accepted [Appellant's] guilty plea. [Appellant] waived his right to a presentence investigation and was immediately sentenced to two consecutive terms of [LWOP] for the first-degree murder charges, with concurrent sentences of 10 to 20 years' imprisonment for each of the criminal conspiracy and burglary charges. The robbery charge was *nolle prossed* at the time of sentencing.

As part of the same proceeding, [Appellant] also pleaded guilty to one count of robbery and one count of conspiracy to commit robbery on Docket No. 4975-2001, and received concurrent negotiated sentences of 10 to 20 years' incarceration on each charge. These sentences were also concurrent with the first count of criminal homicide for Terry Smith. The theft charge was *nolle prossed* as part of the negotiated plea agreement. No post-sentence motions were filed nor did [Appellant] file a direct appeal.

Trial Ct. Op., 6/6/18, 1-11 (some citations and footnotes omitted).

Between 2007 and 2010, Appellant filed two unsuccessful petitions pursuant to the Post Conviction Relief Act[2] (PCRA). On August 9, 2012, PCRA counsel filed a third PCRA petition on Appellant's behalf, raising claims related to the United States Supreme Court's decision in ***Miller v. Alabama***, 567 U.S. 460 (2012).[3] Relying on ***Miller***, Appellant argued that the Eighth Amendment to the United States Constitution prohibits the imposition of mandatory LWOP sentences for homicides committed by juvenile offenders. Appellant concluded that the trial court imposed illegal, mandatory LWOP sentences for his two murder convictions.

On July 7, 2014, the PCRA court denied Appellant's petition, concluding that ***Miller*** did not apply retroactively to cases on collateral review. This Court affirmed the order, and Appellant timely filed a petition for allowance of appeal. On February 24, 2016, the Pennsylvania Supreme Court granted

---

[2] 42 Pa.C.S. §§ 9541-9546.

[3] The United States Supreme Court decided ***Miller*** on June 25, 2012, and Appellant filed his third PCRA petition within sixty days of that decision.

- 6 -

Appellant's petition for allowance of appeal, vacated the Superior Court's decision, and remanded the matter for further proceedings. Specifically, the Court cited the United States Supreme Court's decision in **Montgomery v. Louisiana**, 136 S. Ct. 718 (2016),[4] holding that the States must apply **Miller** retroactively. Thereafter, this Court reversed the PCRA court's order, vacated Appellant's judgment of sentence, and remanded the case for resentencing. **Commonwealth v. Bourgeois**, 1248 MDA 2014 (Pa. Super. July 29, 2016) (unpublished mem.).

On October 27, 2017, prior to Appellant's resentencing hearing, the Commonwealth filed a sentencing memorandum. The memorandum provided a statement of the case, discussion of relevant case law, and a sentencing recommendation. The Commonwealth requested that the trial court sentence Appellant to consecutive terms of fifty years to life imprisonment for each murder conviction and consecutive statutory maximum sentences for Appellant's conspiracy and burglary convictions.

The trial court conducted Appellant's resentencing hearing on November 3, 2017. After providing an on-the-record statement of its considerations, the court resentenced Appellant to consecutive sentences of forty years to life imprisonment for each murder conviction. The court also imposed concurrent sentences of ten to twenty years' imprisonment for the conspiracy and

---

[4] The United States Supreme Court issued this decision on January 27, 2016.

burglary convictions. Therefore, the court imposed an aggregate sentence of eighty years to life imprisonment.

Appellant timely filed a post-sentence motion on November 7, 2017. Appellant argued that he would not be eligible for parole until he is ninety-seven years old, but the average life expectancy in Pennsylvania is seventy-eight and one-half years. Appellant also asserted that "the [t]rial [c]ourt failed to fully appreciate [Appellant's] distinctive youthful attributes and model prisoner status, instead focusing its analysis on the facts and circumstances surrounding the crime itself . . . ." Post-Sentence Mot., 11/7/17, at 2. Appellant concluded that the court imposed a *de facto* LWOP sentence in contravention of **Miller** and **Montgomery**, and he requested that the trial court change the minimum sentence for each murder conviction to thirty-five years' imprisonment. The court denied Appellant's post-sentence motion on December 4, 2017.

Appellant's current counsel subsequently entered her appearance and timely filed a notice of appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court filed a responsive Rule 1925(a) opinion, concluding that it had imposed legal sentences of forty years to life imprisonment for each murder conviction. The court also claimed that it properly weighed all relevant sentencing factors, and it did not abuse its discretion by imposing consecutive sentences for the murder convictions.

While this appeal was pending, the Pennsylvania Supreme Court granted allowance of appeal to consider whether a sentence of fifty years to life for a

single count of first-degree murder constitutes a *de facto* life sentence. ***See Commonwealth v. Felder***, 41 EAL 2018 (Pa. filed June 19, 2018). On February 21, 2018, this Court also decided ***Commonwealth v. Foust***, 180 A.3d 416 (Pa. Super. 2018),[5] and held that we must consider the individual sentences for two counts of first-degree murder, not the aggregate sentence, to determine if a sentence constitutes a *de facto* LWOP sentence. ***Id.*** at 437-38.

Appellant now raises three questions for our review:

1. Did the trial court err in sentencing [Appellant] to an unconstitutional *de facto* life sentence without the necessary procedural protections, considerations and findings enumerated by the Pennsylvania Supreme Court in ***Batts II***?

2. Did the trial court err in failing to consider the ***Miller*** factors on the record prior to sentencing [Appellant] to a *de facto* life sentence?

3. Did the trial court abuse its discretion in sentencing [Appellant] to a *de facto* life sentence by failing to properly apply ***Miller*** and ***Batts II***?

Appellant's Brief at 3 (footnotes omitted).

In his first issue, Appellant cites ***Batts II*** for the proposition that ***Miller*** and ***Montgomery*** "create a presumption of parole eligibility and require a [juvenile offender] to be found irreparably corrupt before they can be

---

[5] The appellant in ***Foust*** timely filed a petition for allowance of appeal with the Pennsylvania Supreme Court on March 23, 2018. On September 5, 2018, the Court entered an order holding the petition for allowance of appeal pending its disposition of ***Commonwealth v. Felder***, 18 EAP 2018. Order, 126 WAL 2018 (Pa. filed Sept. 5, 2018). The Court has scheduled oral argument in ***Felder*** for May 16, 2019.

sentenced to life without parole." *Id.* at 11. Appellant contends the trial court's imposition of an aggregate term of eighty years to life imprisonment created a *de facto* LWOP sentence "that unconstitutionally deprives him of a meaningful opportunity for release as he has not been found to be one of the rare and uncommon juveniles who is irreparably corrupt." *Id.* Appellant acknowledges this Court's decision in *Foust*. *Id.* at 12. Appellant insists, however, that the *Foust* decision "sidesteps the mandates of *Miller* and *Batts II* that [juvenile offenders] convicted of homicide who are capable of rehabilitation be afforded the opportunity for parole." *Id.*

Moreover, Appellant maintains his resentencing hearing was deficient, because the "trial court did not address the central question posed in *Miller*—whether [Appellant] is capable of rehabilitation—prior to sentencing him to what amounted to a *de facto* life sentence." *Id.* at 22. Even though the Commonwealth did not seek a formal LWOP sentence at the resentencing hearing, Appellant argues that the trial court's noncompliance with *Miller*, *Montgomery*, and *Batts II* undermined the entire proceeding and constituted an error of law requiring this Court to vacate Appellant's new sentences. *Id.* at 24.

"We review the legality of a sentence *de novo* and our scope of review is plenary." *Foust*, 180 A.3d at 422 (citation omitted). "[A] trial court may not impose a term-of-years sentence, which constitutes a *de facto* LWOP sentence, on a juvenile offender convicted of homicide unless it finds, beyond a reasonable doubt, that he or she is incapable of rehabilitation." *Id.* at 431.

Nevertheless, "we must consider the individual sentences, not the aggregate, to determine if the trial court imposed a term-of-years sentence which constitutes a *de facto* LWOP sentence." *Id.* at 438. Further, this Court has determined that sentences greater than forty years to life imprisonment for juvenile offenders convicted of murder do **not** constitute impermissible *de facto* LWOP sentences. *See Commonwealth v. Bebout*, 186 A.3d 462, 469-70 (Pa. Super. 2018) (holding that a juvenile offender failed to establish that a sentence of forty-five years to life imprisonment for second-degree murder was not the functional equivalent of LWOP).

Instantly, the trial court emphasized the applicability of *Foust* because Appellant's case involved two murder victims:

> The murder of each [of Appellant's] victim[s] was carried out in a dispassionate and calculated manner, each victim was tortured and mutilated, and each murder showed an exceptionally callous disregard for human suffering.
>
> \* \* \*
>
> The consecutive sentence in this case, given multiple victims and convictions, did not contravene the Commonwealth's statutory sentencing scheme in any way. [Appellant's] argument that he received a *de facto* life sentence because his consecutive, fixed-term sentences for multiple crimes amount to the practical equivalent of [LWOP] is an attempt by [Appellant] to invite the appellate courts to ignore individualized sentencing.
>
> [The] Superior Court soundly rejected this position in its very recent decision in *Commonwealth v. Foust* . . . .

Trial Ct. Op. at 21-22 (citations omitted).

The trial court went on to explain that **Foust** involved a juvenile offender convicted of two counts of first-degree murder, and the **Foust** decision expressed concern over "open[ing] the door to volume sentencing discounts in cases involving multiple juvenile homicide offenses." **Id.** at 23 (quoting **Foust**, 180 A.3d at 436). Consequently, the trial court imposed consecutive sentences of forty years to life imprisonment for each of Appellant's first-degree murder convictions.

In considering the constitutionality of Appellant's individual murder sentences, as mandated by **Foust**, this Court has already determined that a sentence of forty-five years to life imprisonment is not the functional equivalent of LWOP for a juvenile offender. **See Bebout**, 186 A.3d at 469-70. In light of the applicable standard of review and the relevant case law, the trial court did not commit an error of law that requires this Court to vacate Appellant's sentences.[6] **See Foust**, 180 A.3d at 422.

In his second issue, Appellant contends he "is constitutionally entitled to an individualized sentence that reflects his distinct youthful attributes." Appellant's Brief at 25. To guarantee a proper sentence for a juvenile offender facing LWOP, Appellant asserts that a trial court must examine several specific

_____

[6] To the extent Appellant insists that this Court's decision in **Foust** was incorrect, we acknowledge that future rulings from the Pennsylvania Supreme Court may produce new precedent regarding the sentencing of juvenile offenders convicted of first-degree murder. Nevertheless, this Court is constrained to apply existing precedent until such cases are overruled. **See Commonwealth v. El**, 933 A.2d 657, 662 n.3 (Pa. Super. 2007).

factors set forth in *Miller*.[7]  *Id.*  The trial court, however, did not provide any specific findings as to the *Miller* factors for this case.  *Id.* at 26.

Appellant complains, "It is impossible to review whether the court imposed an individualized sentence in accordance with the constitutional mandates of *Miller* if there is no record detailing its considerations."  *Id.* Appellant concludes the court committed legal error by failing to make on-the-record findings regarding the *Miller* factors.  *Id.* at 27.

Significantly, "a sentencing court must consider these *Miller* factors only in cases where the Commonwealth is attempting to meet its burden of overcoming the presumption against juvenile LWOP sentences." *Commonwealth v. White*, 193 A.3d 977, 983 (Pa. Super. 2018) (citation omitted).  Here, the Commonwealth did not attempt to overcome the presumption against juvenile LWOP sentences in Appellant's case.  *See* Commonwealth's Sentencing Mem., 10/27/17, at 6 n.4.  Therefore, the trial court did not need to conduct an on-the-record examination of the *Miller*

---

[7] "[A]t a minimum[, the trial court] should consider a juvenile's age at the time of the offense, his diminished culpability and capacity for change, the circumstances of the crime, the extent of his participation in the crime, his family, home and neighborhood environment, his emotional maturity and development, the extent that familial and/or peer pressure may have affected him, his past exposure to violence, his drug and alcohol history, his ability to deal with the police, his capacity to assist his attorney, his mental health history, and his potential for rehabilitation." *Batts II*, 163 A.3d at 421 n.5 (citation omitted).

factors at the resentencing hearing in Appellant's case. *See White*, 193 A.3d at 983.[8]

In his third issue, Appellant argues that the trial court abused its discretion, because it failed to provide adequate reasons to support the sentence imposed. Appellant's Brief at 28. Even if consideration of the *Miller* factors were not required as a matter of law, Appellant maintains that "the trial court's failure here to properly weigh the mitigating factors on the record resulted in an excessive and unreasonable sentence." *Id.* Appellant also complains that the court "allowed the facts of the crime to impermissibly override mitigation, and it improperly relied on the mandatory minimum established in Section 1102.1." *Id.* at 31.

Appellant's issue is a challenge to the discretionary aspects of his sentence. It is well settled that "[c]hallenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right." *Commonwealth v. Derry*, 150 A.3d 987, 991 (Pa. Super. 2016) (citation omitted). Rather, before reaching the merits of such claims, we must determine:

> (1) whether the appeal is timely; (2) whether [the a]ppellant preserved his issues; (3) whether [the a]ppellant's brief includes a concise statement of the reasons relied upon for allowance of

---

[8] In *White*, this Court cited to *Commonwealth v. Machicote*, 172 A.3d 595, 602 n.3 (Pa. Super. 2017), *appeal granted*, 186 A.3d 370 (Pa. 2018), for the proposition that a court need not consider the *Miller* factors where the Commonwealth does not seek a LWOP sentence. The Pennsylvania Supreme Court granted allowance of appeal in *Machicote* to determine whether a court must consider the *Miller* factors regardless of whether the defendant ultimately receives a LWOP sentence. Order, 4 WAL 2018 (Pa. filed May 22, 2018).

appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is inappropriate under the [S]entencing [C]ode.

*Commonwealth v. Corley*, 31 A.3d 293, 296 (Pa. Super. 2011) (citation omitted).

Instantly, Appellant preserved his issue in a post-sentence motion and timely appealed from the denial of his post-sentence motion. Appellant also included in his brief a Pa.R.A.P. 2119(f) statement. Further, Appellant has raised a substantial question for our review. *See Foust*, 180 A.3d at 439 (holding that an excessiveness claim based upon the imposition of consecutive sentences for two murder convictions presents a substantial question); *Commonwealth v. Zeigler*, 112 A.3d 656, 662 (Pa. Super. 2015) (stating that "an excessiveness claim in conjunction with an assertion that the court did not adequately consider a mitigating factor may present a substantial question" (citation omitted)).

Our standard of review in this context is as follows:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Raven*, 97 A.3d 1244, 1253 (Pa. Super. 2014) (citation omitted).

- 15 -

"A sentencing court need not undertake a lengthy discourse for its reasons for imposing a sentence or specifically reference the statute in question, but the record as a whole must reflect the sentencing court's consideration of the facts of the crime and character of the offender." *Commonwealth v. Crump*, 995 A.2d 1280, 1283 (Pa. Super. 2010) (citation omitted).

> Typically, when sentencing a defendant, the trial court is required to consider the sentencing guidelines. In this case, however, no sentencing guidelines exist for juveniles convicted of first-degree murder prior to June 25, 2012. Instead, our Supreme Court in *Batts II* held that, in these cases, the applicable "sentencing guidelines" that the trial court should consider are the mandatory minimum penalties set forth in section 1102.1.

*Foust*, 180 A.3d at 439 (citations omitted).

> Here, at the resentencing hearing, the trial court explained:

> In determining the minimum sentence in this case, I must look to traditional sentencing considerations as outlined in the applicable statutes and the case law. The sentence imposed here today must take into consideration the protection of the public, the gravity of the offense as it relates to the impact on the life of the victims and the community, and the rehabilitative needs of the defendant.

> In this case, the [c]ourt must also be guided by Title 18, Section 1102.1(a), which provides for a minimum sentence of at least 35 years to life where the offender was 15 years of age or older at the time of the crime. As indicated throughout the records, [Appellant] was 17 years and approximately five months of age on the date he committed these offenses.

> *    *    *

> I do note . . . for the purpose of this sentencing that the actions of [Appellant] on September 6, 2001, which included the torture of the victims, are among some of the most chilling, depraved and

- 16 -

heinous acts I have reviewed in my career as a judge in nearly 18 years.

Although the Commonwealth is not seeking life without parole, and I therefore am not required to make detailed findings on the record regarding all of the factors outlined by the U.S. Supreme Court and our state Supreme Court, as well as the applicable statutes, I have chosen to consider and review all of those factors in arriving at the appropriate sentence here today.

\* \* \*

Again, I have considered in detail the materials provided to me regarding [Appellant's] conduct while he has been incarcerated. I specifically note that his conduct has been commendable as a model inmate. While [Appellant's] good conduct in prison should and has been considered by me in rendering my decision, it is but one factor of many factors to be considered. It does not control or mandate any particular outcome.

There is no doubt that [Appellant] has conducted himself in the manner in which we would want inmates to behave, but some things just cannot be taken back regardless of subsequent behavior.

\* \* \*

I simply cannot accept the proposition that a juvenile offender who commits multiple murders must be afforded a volume discount and not [be] held responsible for each and every life he has taken, even if the sentence imposed approaches a lifetime in prison. Youth matters, but so did the lives of the victims.

N.T. Resentencing, 11/3/17, at 151-52, 155, 157, 158.

In its Rule 1925(a) opinion, the trial court incorporated the above-recited portion of the sentencing hearing where it provided the reasons for the sentence it imposed. *See* Trial Ct. Op. at 33. The court further emphasized:

It is clear that in fashioning this sentence I did weigh all the mitigating and aggravating factors in this case, including the factors outlined in *Batts II* and the *Miller* . . . age-related factors

- 17 -

codified in section 1102.1, even though [Appellant's] individual sentences of 40 years to life imprisonment did not constitute a *de facto* [LWOP] sentence.

[Appellant] submitted a substantial amount of documentation for my consideration. I reviewed all of these materials in exhausting detail, which included documentation of [Appellant's] conduct while in prison since 2003 . . . .

                              *    *    *

In stark contrast to the certificates and achievements presented by defense counsel, the Commonwealth submitted the transcript of [Appellant's] chilling confession, which I carefully reviewed, as well as the gruesome autopsy reports for Lucy and Terry Smith. I further read the entire transcript of [Appellant's] prior guilty plea and sentencing, which included very moving victim impact statements from the children of Terry and Lucy Smith.

                              *    *    *

Finally, I critically observed and assessed the extensive testimony of [Appellant] regarding his idyllic childhood and the "joy in just being with family," the problems that came with his parents' divorce, including a move from Kansas to Pennsylvania, his efforts to fit in at a new high school by drinking, smoking marijuana and ingesting large quantities of Robitussin, his criminal behavior, including theft, robbery and burglary, his relationship with 33-year-old Drenea Rodriguez, and his life in prison following his conviction. [Appellant] described his mother as "very loving," someone who "cared for her children," "wanted the best for us," and "wanted us to succeed in everything that we done [sic]." [Appellant] said Lucy Smith "was definitely a woman who gave her heart to everyone and cared for everyone." And yet, [Appellant] admittedly tortured and brutally murdered this loving and caring mother and her new husband, Terry Smith, because they were simply "try[ing] to love [him]" and trying to help him "be a better person."

*Id.* at 32-35 (citations to the record and footnote omitted).

Based on our review of the record, we find no support for Appellant's

assertion that the trial court failed to consider Appellant's mitigating factors

or that it imposed an excessive sentence. Among other things, the court considered Appellant's age, the circumstances of his childhood and family life, the circumstances of the crimes, the impact on the victims, and Appellant's behavior while incarcerated. *See id.*

Ultimately, the court weighed each of those factors and found that an aggregate term of eighty years to life imprisonment was appropriate. Therefore, we discern no abuse of discretion in the trial court's sentence. *See Foust*, 180 A.3d at 441 (acknowledging that "[a]lthough this Court has previously invalidated lengthy term-of-years sentences that trial courts have run consecutively, most involved property crimes." (citation omitted)); *Commonwealth v. Baker*, 72 A.3d 652, 664 (Pa. Super. 2013) (stating that, in light of our standard of review, where the record demonstrates that the trial court considered the appropriate sentencing factors, "we have no basis to find that the sentence imposed is clearly unreasonable").

Accordingly, we are constrained to affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/12/2019